**E-FILED**
Friday, 24 March, 2017  12:19:53 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| KENT VERNE ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-1360 |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Kent Verne Anderson appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Anderson has filed a Motion for Summary Judgment (d/e 14), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 21).  The parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before this Court.  Consent to the Exercise of Jurisdiction by a United States Magistrate and Reference Order entered August 15, 2016 (d/e 17).  For the reasons set forth below, the Decision of

the Commissioner is REVERSED and REMANDED pursuant to 42 U.S.C. § 405(g) sentence four.

## STATEMENT OF FACTS

Anderson was born on May 11, 1965. He graduated from law school and worked as an attorney until September 3, 2011. Anderson suffers from lymphedema, migraine headaches, depression, anxiety, degenerative joint disease of the left hip, sleep apnea, restless leg syndrome, obesity, history of Harrington rod placement for scoliosis, and history of alcohol abuse. R. 22, 47, 48.

On January 4, 2010, Anderson saw Dr. Antoine Dawalibi, D.O., for swelling in his legs. At that time, Anderson was 68 inches tall and weighed 215 pounds. Dr. Dawalibi assessed leg edema and venous insufficiency. R. 612-13.[1]

From approximately January 19-26, 2010, Anderson was seen at the Mayo Clinic for several conditions. R. 700-11. Anderson saw neurologist Dr. Fred Curtrer for migraine headaches and Dr. Roger Shepherd in the Vascular Center for edema in his legs. Dr. Shepherd diagnosed obstructive lymphedema in the right leg and swelling in the left leg due to "dependency, weight, and salt." Dr. Shepherd prescribed compression

---

[1] See R. 688 for notation of Dr. Dawalibi's credentials as a doctor of osteopathy.

stockings and lubricating lotion for the skin on Anderson's legs. Dr. Shepherd also recommended "losing weight, exercising, and cutting back on salt" to "help with the leg swelling." R. 700.

Dr. Curtrer assessed episodic migraine headaches without aura. Dr. Curtrer prescribed Ketoprofen to be taken within 15 minutes of the onset of a headache. For severe headaches, Dr. Curtrer recommended Rizatriptan. Dr. Curtrer also recommended taking Divalproex and Depakote regularly to reduce the severity of the headaches. R. 711.

On February 25, 2010, a lymphoscintigram showed previous lymphatic damage in the lower right leg, with no lymphatic obstruction above the right knee and no obstruction on the left. R. 688.

On May 8, 2010, Anderson was the subject of a sleep study at the Illinois Neurological Institute (INI) Sleep Center. Anderson was given the study due to excessive daytime sleepiness and fatigue, and difficulty falling and staying asleep at night. At that time Anderson measured 65 inches in height and weighed 232 pounds. The study showed severe obstructive sleep apnea with associated hypoxemia and sleep disruption. Anderson was prescribed a CPAP machine to be used at night while sleeping.

R. 662.[2]

On or about September 10, 2010, Anderson saw Dr. Curtrer again at the Mayo Clinic for migraine headaches. Dr. Curtrer recommended adding Topamax as a prophylactic medication. R. 1327.

On March 8, 2011, Anderson was seen at the University of Illinois Department of Psychiatry and Behavioral Medicine for worsening depression. Anderson was previously diagnosed with dysthymia. He was undergoing regular cognitive behavioral therapy (CBT) with Dr. McIntyre, a psychologist. Anderson reported that his depression was worsening and he had symptoms of anxiety, psychosis, and suicidal ideations. R. 1693. Anderson was assessed with dysthymic disorder, major depressive disorder, and alcohol dependence in sustained full remission. He was counseled to remove a firearm from his home due to his suicidal ideations. He was counseled to modify his current medications to either increase the dosage of Cymbalta or add a second medication, Remeron. The record of the examination was signed by a medical student and psychiatrist Dr. Peter Alahi, M.D. R. 1695-96.

On or about May 20, 2011, Anderson returned to the Mayo Clinic. Dr. Shepherd again prescribed compression stockings for the edema and

---

[2] CPAP stands for Continuous Positive Airway Pressure. See Dorland's Illustrated Medical Dictionary (32$^d$ ed. 2012) (Dorland's), at 427.

recommended diet, weight loss, and exercise.  R. 751.  Anderson also reported that the Topamax for his migraine headaches caused some tolerable sleepiness, but intolerable depression.  R. 751-52.  Nurse Practitioner M.C. McDermott, R.N., C.N.P., recommended Botulinum A Toxin (Botox) injections and Gabapentin to reduce the frequency and severity of his headaches.  R. 755.

On October 5, 2011, Anderson again went to the Mayo Clinic.  Dr. David McFadden, M.D., was Anderson's primary physician at the Mayo Clinic at this time.  R. 1248-49.  Anderson reported significant side effects with the prophylactic medications he was taking for migraine headaches. He began Botox injections for his headaches.  R. 1252.

On October 10, 2011, Anderson went to the INI Sleep Center for a follow up visit regarding his sleep apnea.  Anderson saw Nurse Practitioner Diedra Lewandowski, M.S., A.P.N., A.C.N.P.-B.C.  Anderson reported that he was fitted with an oral appliance to wear at night.  He reported that he was taking off the CPAP mask at night during his sleep and that he stopped using the CPAP.  Anderson reported significant daytime sleepiness. Lewandowski's impression was that Anderson's sleep apnea was well controlled with the CPAP, but he was not using it.  Sometimes he fell

asleep without it, sometimes he took it off inadvertently during the night, and sometimes he did not sleep long enough at night.  R. 470-71, 474.

On November 18, 2011, Anderson saw neurologist Dr. Richard Lee, M.D. for migraine headaches, restless leg syndrome, and sleep disorder. Anderson reported that the Botox injections seemed to help a little with his headaches.  Anderson stopped taking the gabapentin.  Anderson reported that the CPAP machine was helpful for his sleep disorder.  Dr. Lee recommended continuing the Botox injections for the migraine headaches. R. 991-92.

On November 30, 2011, a disability representative of the Mayo Clinic completed a form for Anderson to submit with a private disability insurance claim.  The form stated, in part:

> On November 29, 2011, David D. McFadden, MD stated the patient [Anderson] is unable to work from September 3, 2011 through March 3, 2012. Recommend re-evaluate after six months. Recommend total disability for six months.
> .
> Diagnosis:  Severe obstructive sleep apnea, depression, insomnia, restless leg syndrome.  Follow-up with local primary care provider in Peoria, Illinois.
>
> The above information is provided for your use in processing a disability claim.

R. 1229.

On or about January 19-26, 2012, Anderson went to the Mayo Clinic. Anderson reported to Dr. McFadden that he was still not getting restful sleep even though he was using his CPAP machine. Dr. McFadden stated that there was a problem with mask incompatibility. Dr. McFadden referred Anderson to the Mayo Clinic Sleep Clinic to address the problem. R. 1210. Anderson saw Dr. Mithri Junna, M.D., at the Sleep Clinic. Dr. Junna could not identify a reason why Anderson took his CPAP mask off during sleep. Dr. Junna increased the heat in the humidifier in the CPAP machine to reduce nasal congestion while using the machine. Dr. Junna told Anderson to wear the CPAP mask during the daytime for progressively longer periods over time, starting with 30 minutes without the machine and building up to 120 minutes with the machine running. Dr. Junna stated that when Anderson used the machine there was no significant leakage and he did not have residual apneas. Dr. Junna also offered to find Anderson a less annoying mask. Dr. Junna finally emphasized the importance of having "a set bedtime and waketime, only using the bedroom for sleeping and for sex, and avoiding sleeping in any other place but his bed." R. 1204.

During this visit, the Mayo Clinic neurology department conducted an EEG. The EEG was normal, but showed snoring and symptoms of sleep apnea. R. 1210.

Anderson also saw psychologist Dr. Keith Rasmussen, Ph.D. at Mayo

Clinic during this visit. Dr. Rasmussen diagnosed Anderson as depressed.

He noted that Anderson recently started taking Ritalin in addition to his

other medications. Dr. Rasmussen concluded that Anderson was

overmedicated and told Anderson not to take the Ritalin. Dr. Rasmussen

stated that Anderson could not work:

> He still remains pretty depressed and nonfunctional. He is not
> able to work at his job. He showed me a letter that was given to
> him by his job where very specific requirements were laid out
> as to how he handles his day and showing up to work on time
> and so forth. He attempted to go back to work but was unable
> to do that. Currently he is on Family Medical Act Leave, and he
> is applying for disability. He remains pretty dysphoric most of
> the time. His thoughts are pretty scattered in the room talking
> with him, although his demeanor is pleasant and polite. I do not
> think he is psychotic. I do not think he is manic either. I think he
> is overmedicated at this point.

R. 1224. Dr. Rasmussen recommended electroconvulsive therapy (ECT).

Dr. Rasmussen stated that Anderson could taper off his antidepressant

medication if the ECT was effective. Dr. Rasmussen noted that

antidepressant medication can aggravate restless leg syndrome. R. 1227-

28.

On February 10, 2012, Dr. McFadden wrote a letter which stated:

To Whom It May Concern:

The above referenced patient was evaluated at Mayo Clinic in
September of 2011 and more recently in January of 2012. Due

to multiple medical problems, I highly recommend patient be considered totally medically disabled through June 1, 2012, at which time he will be re-evaluated.

Please let me know if any further details are needed.

R. 1187.

On February 22, 2012, Anderson went to the INI Sleep Clinic for a follow-up. Dr. Sarah Zallek assessed that Anderson was having problems with excessive sleepiness and related problems because he was not practicing good sleep hygiene and poor CPAP compliance. Anderson had not followed Dr. Junna's instructions about establishing regular sleeping patterns. Anderson had not followed Dr. Junna's recommendation to desensitize himself to the mask during the daytime. Anderson reported that he regularly dozed off without using the CPAP machine. When he used his CPAP, he stopped using the machine if he got up during the night to go to the bathroom. R. 1433. Dr. Zalleck noted:

> Bedtime is 0030-0430. Sometimes he is on the couch late at night and too sleepy to go to bed, so he will try to "nap" for an hour by setting an alarm, but will sleep through that and sleep through the night there. He used to wake up consistently (spontaneously) around 0600, but lately he has been sleeping as late as 0800 or 0900. He dozes off at times throughout the day. Often he is unaware that he is doing this. If he could choose an 8-hour window during which to sleep he would sleep 0000-0800 or 0l00-0900.

R. 1434.  Dr. Zallek noted that Anderson's psychiatrist in Springfield, Dr. Alahi, did not agree with Dr. Rassmussen about either stopping the Ritalin or using ECT.  Anderson was following Dr. Alahi's recommendation and was still taking two doses of Ritalin daily.  Dr. Zallek noted that the Ritalin might be interfering with Anderson's ability to sleep at night.  R. 1433-34.  Dr. Zallek recommended talking to Dr. Alahi about discontinuing the second dose of Ritalin. Dr. Zallek felt the restless leg medication might also be affecting Anderson's sleep patterns.  Dr. Zallek noted that improving sleep hygiene and CPAP compliance would probably improve his restless leg syndrome.  R. 1436.

On March 2, 2012, Anderson was admitted to the emergency room at Saint Francis Medical Center in Peoria, Illinois, with suicidal ideation.  R. 1377.  Anderson had a normal mood and affect.  He was not anxious.  His affect was neither angry nor blunt.  He had suicidal ideations, but not suicidal plans.  He had no homicidal ideations or plans.  R. 1383.  Anderson was enrolled in a partial hospitalization program and released to go home on March 3, 2012.  Anderson was diagnosed with major depressive order, recurrent, moderate, dysthymic disorder, and anxiety disorder.  R. 1384, 1410.

From March 13, 2012, to March 27, 2012, Anderson was admitted to the Methodist Medical Center of Illinois' partial hospitalization program (PHP) with a diagnosis of major depression disorder without psychosis. Anderson was taking Cymbalta and Ritalin. The medication was positive and effective. The discharge note stated that the PHP treatment decreased Anderson's anxiety and depression. The admission to PHP was precipitated by Anderson's breakup with his girlfriend. At the end of the PHP treatment, Anderson's prognosis was good. Upon discharge, Anderson would follow up with Dr. Alahi for medication management, and would continue counselling with Dr. McIntyre. R. 1480, 1485.

On June 11, 2012, state agency psychologist Dr. Thomas Low, Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. R. 1501-17. Dr. Low opined that Anderson had depression, and the depression caused moderate restrictions in activities of daily living; moderate difficulties in maintaining concentration, persistence, or pace; and mild difficulties in maintaining social functioning. Dr. Low opined that Anderson had no episodes of decompensation of an extended duration. R. 1511. Dr. Low opined that Anderson's "statements regarding depression were credible and consistent with the objective medical findings." R. 1513.

Dr. Low further opined that Anderson was moderately limited in his ability to: understand and remember detailed instructions; carry out detailed instructions; and maintain attention and concentration for extended periods. Dr. Low opined that Anderson did not have any other functional limitations due to his mental condition. R. 1515-16. Dr. Low concluded, "The claimant has some impairment of his attention and can get overwhelmed at work. He can however follow simple directions and he can do simple tasks. . . . Within the above limits claimant retains the capacity for work." R. 1517.

On June 12, 2012, state agency physician Dr. Barry Free, M.D., prepared a Physical Residual Functional Capacity Assessment. R. 1519-26. Dr. Free opined that Anderson could lift twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours in an eight-hour workday; and sit for six hours in an eight-hour workday. R. 1520. Dr. Free opined that Anderson should only occasionally: climb ropes, stairs, scaffolds, and ladders; stoop; kneel; crouch; and crawl. R. 1521. Dr. Free opined that Anderson should avoid concentrated exposure to noise due to migraine headaches. R. 1523. Dr. Free stated that Anderson's statements about his migraines were credible and consistent with the objective medical findings. R. 1524. Dr. Free concluded, "The claimant had the ability to do light work with some postural and environmental limitations." R. 1526.

On June 16, 2012, Anderson prepared a Social Security Administration Function Report/Adult form. Anderson reported that he lived alone in his own house. He did not have a set daily routine. He reported that it may take him all day to take his medicines, eat, take care of his personal hygiene and get dressed. R. 255-56. Anderson reported that he took care of a pet dog. He took the dog to the groomer and the vet as needed. R. 256. He did laundry and dishes. He paid for mowing, lawn care, and house cleaning services. R. 257. Anderson went to church two to three times a month, went to AA meetings, and talked to his parents over the phone. Anderson drove his own car short distances. R. 259. Anderson opined that he could walk 50 to 150 feet without stopping; he could pay attention anywhere from a few seconds to five minutes; and had trouble following instructions. R. 260.

Anderson reported on the Function Report/Adult form that the U.S. Office of Personnel Management found that he was disabled due to migraine headaches, restless leg syndrome, depression, and sleep apnea. R. 262, 284.

On July 10, 2012, Anderson saw Dr. Lisa Snyder, M.D., for Botox injections for migraine headaches. Anderson reported that the injections were helpful for pain relief without any side effects. Dr. Snyder found that

Anderson could tolerate a higher dose of Botox.  Anderson reported increased pain since the weather had been hotter.  Dr. Snyder administered the Botox injections.  R. 1546.

On August 15, 2012, Anderson saw neurologist Dr. Richard Lee, M.D., for a follow-up visit for migraine headaches, restless leg syndrome, depression and sleep apnea.  Anderson reported that "on August 5, 2012, he was swimming in a pool and hit his head on the wall of the pool and had a slight head injury."  Anderson went to the Emergency Room. He did not have a concussion, but x-rays sowed arthritis in his neck.  Anderson reported head and neck pain after the accident.  Dr. Lee ordered an MRI of the cervical spine.  R. 1577.  The MRI showed limited flexion at C1, degenerative disc disease and spondylosis.  R. 1584.

On September 12, 2012, Anderson saw Dr. Michael J. Gootee, M.D., to discuss MRI results.  Anderson reported increased migraine headaches since the pool accident.  Dr. Gootee reported that Anderson "seems to be doing well with his CPAP, but admits to not always using this faithfully and sometimes when he wakes up in the middle of the night this will be on the floor."  R. 1684.

On September 18, 2012, Dr. Alahi wrote a letter to Anderson's attorney.  The body of the letter stated, in part:

This is in response to your letter dated September 12, 2012 with respect to Mr. Kent Anderson. I have worked with Mr. Anderson for greater than a year, and I feel that he has had significant anxiety and depressive, and cognitive symptoms that have led him to be incapacitated from his ability to work as an attorney. Unfortunately, he has not responded despite multiples from therapeutic interventions as well as ongoing psychotherapy. At this time, I am afraid to state that I do not have any confidence in his ability to maintain the concentration, persistence, and pace required of his former workplace and, unfortunately, of most workplaces in general. He has had diminished sleep, diminished concentration, low self esteem, suicidal ideation, anxiety, insomnia, anhedonia, and social withdrawal. He has had significant memory change, and his personality structure has become somewhat inflexible and maladaptive under the circumstances.

R. 1686.

On October 17, 2012, psychologist Dr. Joseph Mehr, Ph.D., affirmed Dr. Low's opinions regarding Anderson's mental condition and his functional limitations due to that condition. R. 1726-27. On October 22, 2012, Dr. C.A. Gotway, M.D., affirmed Dr. Free's opinions in his Physical Residual Capacity Assessment. R. 1726-27.

In June 2013, Anderson went back to the Mayo Clinic. On June 13, 2013, Anderson saw Nurse Practitioner N.A. Honeychuck, R.N. C.N.P., in the Neurology Department regarding his migraine headaches. Anderson reported that the Botox worked well until: he hit his head in a swimming pool; he was over a month late for a Botox injection; and increased stress

due to the death of his father.  Honeychuck opined that the Botox injections would be effective over time:

> I suspect his headache control will slowly go back to his formerly tolerable baseline if he is able to continue to have his Botox injections on schedule, stringently decrease his use of analgesic and triptan medications, and manage to use his CPAP with better consistency, in particular.

R. 1777.[3]  In addition to the Botox injections, Honeychuck suggested Petadolex and metoprolol as prophylactic treatments for his migraines.  R. 1777.

Anderson was urged by healthcare professionals at the Mayo Clinic to be compliant with his CPAP.  His CPAP was adjusted.  He was advised to improve his sleep hygiene.  R. 1782.

Anderson underwent neuropsychometric testing at the Mayo Clinic. The testing showed "possible frontal lobe dysfunction that includes problems with cognitive flexibility, difficulties with response inhibition and deficits and problems with processing speed, but basic attention was intact."  The Mayo Clinic Neurology Department, however, did not comment on cognitive issues and Anderson was stable.  R. 1782-83.

On August 20, 2013, Anderson was seen by the sleep department at St. Francis Medical Center in Peoria, Illinois.  He was assessed with

---

[3] Triptans are a group of serotonin receptor agonists used to treat migraines.  Dorland's, at 1969. Anderson's migraine medication Maxalt (rizatriptan benzoate) is in this group.  Dorland's, at 1114.

behaviorally induced insufficient sleep syndrome. Anderson "continues to prolong his bedtime until he dozed inadvertently and sleeps on and off during the day. Actigraphy has confirmed this. His sleep habits adversely affect his CPAP compliance." The assessment indicated that better CPAP compliance and sleep hygiene would improve his daytime sleepiness and his restless leg syndrome. The Assessment indicated that Anderson might not need the Ritalin if his sleep hygiene and CPAP compliance improved. The assessment recommended that Anderson go to bed at a consistent time and use his CPAP consistently. R. 1895.

On September 13, 2013, Anderson underwent testing at the INI Memory Disorders Clinic in Peoria, Illinois. The memory tests showed normal results. R. 1955, 1963-64.

On November 6, 2013, neurologist Dr. Lee filed a form entitled "Claimant/Patient Meets or Medically Equals Social Security Listing. Dr. Lee opined that Anderson's condition met or was medically equal to Social Security Listing 12.04. The "Listings" are a list of conditions set forth in the Social Security regulations which can render a person disabled without respect to the person's age, education, or work experience. 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing); see 20 C.F.R. §§ 404.1520(d),

416.920(d).[4] Listing 12.04 sets forth the circumstances under which a

person with affective mental disorders such as depression could be

disabled without respect to the person's age, education, or work

experience.

On November 8, 2013, Dr. Alahi wrote a letter to Anderson's attorney.

Dr. Alahi stated in the body of the letter:

> This is a response to your letter of November 5, 2013 regarding
> Mr. Kent Anderson. It is my opinion in working with Mr.
> Anderson that he has significant depression, anxiety and
> attention deficits that will make it extremely difficult for him to
> keep his mind on simple tasks and to perform them routinely or
> for any extended period of time given a regular workload.
>
> Secondly, I believe that Mr. Anderson, should he attempt to
> work, would be unable to tolerate the pressures of work which
> will require increased mental health services that will cut into
> his ability to work for minimally, several days a month. Lastly,
> placing Mr. Anderson in a simple repetitive task performance
> environment will likely lead to deterioration in function given his
> personality structure, he will be unable to attain levels of
> productivity and performance that he had previously attained
> given his educational level, and would make it less than viable
> for him to continue work.
>
> Unfortunately, I believe that Mr. Anderson's symptomatology
> and symptom severity lead to him being deemed disabled from
> regular work. This is despite the fact that he has multiple
> pharmacotherapy and psychotherapy interventions.

R. 2055.

---

[4] The person must still not be engaged in substantial gainful activity to be disabled even if he or she had a
condition that met or medically equaled a Listing. See 20 C.F.R. §§ 404.1520(b), 416.920(b).

## THE ADMINISTRATIVE HEARING

On December 3, 2013, the Administrative Law Judge (ALJ) conducted an evidentiary hearing. Anderson appeared with his attorney. Anderson's mother Margaret Anderson and vocational expert Ronald Malik also appeared. Anderson testified that he lived with his dog in his single family residence. He received employee disability income from the federal government. He testified that he drove 50 to 100 miles per week. He generally drove short distances because he became tired driving. R. 48-49.

Anderson testified that he could not work because he did not have sufficient short-term memory and could not concentrate to perform his old job as an attorney. He also said he could not work because he was excessively tired and fell asleep in the middle of the day. He also said he could not work because of his depression. R. 50-51.He said his problems "kind of feed, undoubtedly, feed off each other." R. 51.

Anderson said that he still had problems with headaches:

Q   Okay. Are you still having problems with headaches?

A   It's – yes.  I mean, it kind of goes into stages how often.

Q   Okay.

A   It would be quite a while for a while and then not so often and then more often and so forth.

R. 51.  Anderson said headaches varied from two or three a month up to five a week.  R. 59-60.  Anderson testified that he took ketoprofen at the onset of a migraine and Maxalt if the ketoprofen did not work within 45 minutes.  He usually tried to lie down.  He sometimes put ice on his forehead. R. 54, 86.  He received Botox injections as a "preventative."  R. 54.  He said the headaches lasted "a couple of hours" with the medication. The pain could be at a 2 or 3 out of 10 if the medication worked, or up to an 8 or 9 out of 10. R. 60.

Anderson testified that his depression was "not as bad as it had been."  He said he felt a little bit down with a lack of motivation.  He said "I might be able to function pretty well for an hour or two by then I kind of run out of steam or something and I also don't know which hour or two of the day it's going to be."  Once he ran out of steam, Anderson testified that he started nodding off or losing focus, or he might just give up trying and take a nap.  He said he took a nap, voluntarily or involuntarily, almost every day. R. 87.  He said he nodded off several times a day.  R. 88.

Anderson said anxiety was a big problem.  R. 68.  He said he became anxious attending events like the hearing, and trying to make a decision.  R. 86.  He said the depression and fatigue went together. Anderson testified that he saw family and friends sometimes.  He was less

isolated than he was a year before the hearing, but more isolated than earlier in his life.  R. 68.

Anderson testified that he tried to use a CPAP at night to sleep:

Yes, I do or at least I attempt to. I put it on when I go to bed and usually have it on when I get up, wake up but the machine says I'm not using it the whole time in between so I'm not, I'm still trying – I haven't figured out what's happening exactly.

R. 71-72.  Anderson testified that he took a long time to get ready in the morning:

Usually, it ends up being at least a couple of hours as I kind of eat breakfast, maybe watch a little TV or read something or whatever and maybe nod off several times. Go to the bathroom which I may nod off there too. And then it's about that time after I'll end up going back to bed for a while, an hour or two, usually and (sic) hour or so, sometimes longer.

R. 77.  Anderson said his daytime sleepiness began in 2010 or 2011.  He said his sleepiness was a big problem at work.  He fell asleep while researching or writing.  He was asleep for anywhere from a few seconds to an hour, but usually several minutes.  He sometimes fell asleep standing up.  R. 78.  He testified that his performance at work worsened because of his sleepiness and headaches.  At the end he thought he was going to get fired and disbarred.  He testified that he seriously considered suicide. Anderson said he seriously considered suicide on four different occasions. R. 83.

Anderson testified that he cooked his own meals.  He usually ate prepared frozen foods that could be heated in a microwave oven.  Occasionally he prepared eggs or a hamburger helper meal.  R. 84.

Anderson did his own grocery shopping, but he took a long time because he could not remember what he needed to get.  R. 73.  He said he would lose focus in the store.  He said he spent a long time reading labels and had trouble deciding which products to buy.  He ended up spending a long time at the grocery store without realizing it.  R. 75-76.

Anderson attended AA and Al-Anon meetings.  He enjoyed reading and watching movies on television.  He used a computer.  He stayed on the computer for a couple of hours at a time.  He did not have problems watching television or movies unless he fell asleep.  R. 70-71.  Anderson testified that went to church, but not as often as he used to.  He met friends at AA and Al-Anon meetings. R. 73.

Anderson traveled to California at Christmas time to visit his parents for a week or two.   He visited more often recently because his father became ill and then died.  R. 70.

Anderson testified that he could not work an unskilled job such as a janitor, because he would not be able to stay awake for a whole shift.  He also could not keep his mind on what he was doing.  R. 85.

Anderson's mother Margaret Anderson then testified. She testified that Anderson stayed with her in California about two months when her husband, his father, died. R. 90.

Margaret Anderson testified that Anderson was not a social person. He lived alone. He swam in the pool at his house. R. 92.

She said that Anderson lost track of time. He often ate dinner at 10:30 pm or 11:00 pm. He sometimes allowed the food to spoil because he forgot that he thawed it. R. 93.

She said that Anderson couldn't concentrate and couldn't function when he was working. "[H]e just couldn't function at all for sometimes a half or more and then he'd forget where he was and have to start over again." R. 94.

She testified that Anderson had trouble talking to her over the phone:

Pauses at times when I'd say something and he'd just go blank and I'd say, so I'd go, Kent, are you there, because I wasn't sure whether we got disconnected or just exactly what happened but, usually, it was he just, he was there and he just either wasn't processing what I said or wasn't awake enough to talk to me or whatever. I really don't know since I wasn't sitting there at the time looking at him.
. . . .
He said, I'm just tired, mom.

R. 95.

The vocational expert Malik then testified.  The ALJ asked Malik the following hypothetical question:

> Q    Okay.  For my first hypothetical then, I'd like you to consider a hypothetical claimant of the same age, education and past work experience as this claimant limited to a range of light work; occasionally climbing ramps and stairs; occasionally stooping, crouching, crawling, kneeling, balancing; occasionally climbing ramps – or occasionally climbing – oops, I'm sorry . I already said that – no ladders, ropes and scaffolds; limited to detailed but not complex tasks; no work that's regarded as fast pace .  Is there any past work he could perform?

R. 99.  Malik opined that such a person could not do Anderson's prior work. Malik testified that such a person could perform a variety of jobs, including wiring assembler, with 2,000 such jobs in Illinois and 22,900 nationally; packager, with 1,000 such jobs in Illinois and 21,800 nationally; polisher, with 1,300 such jobs in Illinois and 28,200 nationally; parts trimmer, with 800 such jobs in Illinois and 16,500 nationally; sorter, with 1,100 such jobs in Illinois and 25,100 nationally; and document prep clerk, with 1,100 such jobs in Illinois and 29,800 nationally.  R. 100-01.

Malik opined that the person could not perform any of these jobs if he was off-task more than fifteen percent of the time or if he had to miss two days of work a month.  R. 101.   Anderson's attorney questioned Malik and then the ALJ ended the hearing.

## THE DECISION OF THE ALJ

On January 24, 2014, the ALJ issued her decision. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal a Listing specified in 20 C.F.R. Part 404 Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Anderson met his burden at Steps 1 and 2. Anderson had not engaged in substantial gainful activity since September 3, 2011.  The ALJ found that Anderson suffered from the severe impairments of lymphedema, migraine headaches, depression, anxiety, degenerative joint disease of the left hip, sleep apnea, restless leg syndrome, obesity, history of Harrington rod placement for scoliosis, and history of alcohol abuse.  R. 22.

The ALJ found at Step 3 that Anderson's impairments or combination of impairments did not meet or medically equal a Listing.  The ALJ discussed several Listings including Listings for depression, migraine headaches, and sleep apnea.  The ALJ found that Anderson "has not fully taken advantage of the use of his CPAP device, and he exhibits poor sleep

hygiene."  The ALJ further found, "In August 2013, . . . the claimant

continued to volitionally prolong the time he goes to bed, and he dozed

inadvertently.  The claimant continued to sleep on and off during the day

and had insufficient sleep syndrome due to deliberate poor sleep hygiene."

The ALJ relied on the June 2013 records from the Mayo Clinic, the records

from the INI Sleep Lab, and August 2013 records from the Saint Francis

Medical Center Sleep Center.  The ALJ found that Anderson's sleep apnea

did not meet or equal the requirements of Listing 3.10 for sleep apnea. R.

25.

The ALJ found the following regarding Anderson's migraine

headaches:

> The claimant has migraine headaches, which are treated with
> medication and botox injections. The claimant does not display
> disabling symptoms of a neurological disorder as described in
> section 11.18 (cerebral trauma) of the listed impairments, and
> he does not display disabling symptoms of another neurology
> system disorder as set forth in sections 11.00-11.19 of the
> listing of impairments.

R. 25 (internal citations to the record omitted).

The ALJ found that Anderson did not meet Listings 12.04 and 12.06

for affective disorders such as depression and anxiety disorders.  The

Social Security Administration recently revised Listings 12.04 and 12.06.

The revisions became effective January 17, 2017.  Revised Medical

<u>Criteria for Evaluating Mental Disorders</u>, 81 Fed. Reg. 66138, 2016 WL 5341732 (September 26, 2016).  Changes to regulations apply retroactively if the regulations only clarify the current law rather than make substantive changes. <u>Pope v. Shalala</u>, 998 F.2d 473, 483 (7th Cir. 1993) <u>overruled on other grounds</u>, <u>Johnson v. Apfel</u>, 189 F.3d 561 (7th Cir. 1999).  "In determining whether the rule is a clarification or change in the law, the intent and interpretation of the promulgating agency as to the effect of the rule is certainly given great weight.  They are not, however, dispositive." <u>Id.</u> The Commissioner stated that these revisions apply retroactively "to claims that are pending on or after the effective date." 81 Fed. Reg. at 66138.[5] The Court has reviewed the amended regulations and agrees that the amendments are only clarifications and not changes in the law.  The Court, therefore, will apply the revised Listings 12.04 and 12.06 retroactively.

To meet either revised Listing 12.04 or 12.06, Anderson needed to show (A) that his disorder included five of the listed symptoms such as sleep disturbance, difficulty concentrating, or suicidal thoughts; and the disorder resulted in either: (B) extreme limitations in one or marked limitations in two of the following areas of mental functioning: (i)

---

[5] In contrast, the Commissioner recently changed the regulations regarding the interpretations of medical evidence.  The Commissioner stated several of the amendments to those regulations applied prospectively to claims filed on or after the amendment's effective date of March 27, 2017. <u>Revisions to Rule Regarding the Evaluation of Medical Evidence</u>, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).

understand, remember and apply information; (ii) interact with others; (iii) concentrate, persist, or maintain pace; and (ii) adapt or manage oneself; or (C) the disorder is serious and persistent, meaning the disorder has lasted at least two years and has evidence of (1) medical treatment, mental health therapy, psychosocial supports or a highly structured setting that diminishes symptoms; and (2) minimal capacity to adapt to changes in environment and demands of daily life.  Listing 12.04.

The ALJ and the parties referred to the versions of the Listings that were in effect before January 2017.  The ALJ found that Anderson's condition met subsection A, but did not meet the requirements of either subsections B or C.  The ALJ found no evidence of an inability to adapt or manage himself, moderate limitations in Anderson's ability to concentrate, persist, or maintain pace and only mild limitations in the other two areas. The ALJ found no evidence that Anderson's condition was sufficiently severe and persistent to meet the requirements of subsection C.  R. 24.

The ALJ also considered Anderson's obesity at Step 3.  The ALJ found that Anderson's impairments when combined with the impairments caused by his obesity did not meet a Listing.  R. 25.

The ALJ found at Step 4 that Anderson had the following RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to

perform light work as defined in 20 CFR 404.1567(b) except he is unable to climb ladders, ropes, or scaffolding; he is limited to occasional stooping, crouching, crawling, kneeling, balancing, and climbing ramps or stairs; he is capable of performing detailed but not complex work tasks; and he is unable to perform fast paced work.

R. 26. Light work is defined, in relevant part, as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b). The ALJ based this finding on Anderson's ability to live independently and perform a wide range of activities, the lack of objective medical tests that showed disabling functional limitations, and the lack of disabling side effects to his medications. The ALJ also relied on the opinions of Drs. Low, Free, Mehr, and Gotway. R. 27-28. The ALJ stated that he gave some weight to these doctors' opinions, but varied his findings from their opinions after "considering the recently submitted medical evidence as well as the testimony at the hearing." R. 27.

In reaching the RFC finding, the ALJ found that Anderson's testimony about the severity of his symptoms was not credible. The ALJ based this credibility finding on the lack of objective medical evidence, Anderson's ability to live independently and engage in many activities, and objective

medical evidence.  The ALJ concluded, "These other factors, the description of daily activities, and the objective medical evidence concerning the claimant's impairments all contradict the Claimant's allegations of complete and total disability; the claimant's testimony that he is unable to work therefore cannot be fully accepted."  R. 26-27 (citation omitted).

The ALJ also gave no significant weight to the opinions of Drs. Lee, Alahi, and McFadden.  The ALJ discounted Dr. Lee's opinion that Anderson's depression and anxiety equaled Listing 12.04 because Dr. Lee was a neurologist rather than a psychiatrist and because Dr. Lee offered no explanation for his opinion and did not specify the functional limitations caused by Anderson's depression.  R. 27.

The ALJ stated that Dr. Alahi's conclusion that Anderson was disabled was not a medical opinion, but an opinion on a matter left to the Commission.  The ALJ stated Dr. Alahi's opinion that Anderson could not work as an attorney was not relevant to the question of whether Anderson could work.  The ALJ found that Dr. Alahi's other opinions that Anderson could not perform simple tasks on a sustained basis and could not maintain the concentration, persistence and pace required by most work places were "contradicted by the claimant's description of his daily activities."  The

ALJ explained, "Despite his mental problems, the claimant is able to live independently and perform the tasks necessary to do so.  He performs multiple simple tasks and detailed tasks during the day."  The ALJ gave no significant probative value to Dr. Alahi's opinions in light of this contradictory evidence.  R. 27.

The ALJ gave no weight to Dr. McFadden's opinions because the opinions appeared to be directed to whether Anderson could perform his prior work as an attorney.  The ALJ also noted that Dr. McFadden only opined that Anderson was disabled for a limited period of time from November 2011 to June 2012.  The Social Security Administration regulations defined disability as a condition that prevents a person from working for twelve consecutive months or was expected to result in death.  R. 28.  The ALJ also found that Dr. McFadden did not explain the basis for his opinion.

The ALJ concluded at Step 4 that Anderson could not perform his prior work as an attorney.  R. 28.

The ALJ found at Step 5 that Anderson could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Malik that a person with Anderson's age,

education, work experience, and RFC could perform the jobs of wiring assembler, packager, polisher, parts trimmer, and sorter.  R. 29.

The ALJ concluded that Anderson was not disabled.  R. 30.

Anderson appealed the decision.  On June 24, 2015, the ALJ denied Anderson's request for review.  The decision of the ALJ became the final decision of the Commissioner.  R. 1.  Anderson then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).  "If an ALJ's decision contains inadequate evidentiary support or a cursory analysis of the issues, this court will reverse."  Luster v. Astrue, 358

Fed. Appx. 738, 740 (7th Cir. 2010) (citing Lopez v. Barnhart, 336 F.3d 535,

539 (7th Cir. 2003).

In this case, the ALJ provided only a cursory explanation of his

treatment of much of Dr. Alahi's opinions.  This cursory explanation did not

build an accurate and logical bridge from the evidence to his conclusion.

Dr. Alahi was Anderson's treating psychiatrist since March 2011.  As such,

his opinions are entitled to controlling weight if the opinions are supported

by objective medical evidence and consistent with other substantial

evidence in the record.  20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532

F.3d 606, 608 (7th Cir. 2008).  However, the consideration of the medical

opinion does not end here.

> If the "medical opinion" from the "treating source" survives this two-part test, the Administration must adopt the opinion. POMS DI 24515.004.B.1  If, on the other hand, the "medical opinion" fails the two-part test, then the opinion is weighed by considering the "checklist factors."  20 C.F.R. §404.1527(c)(2)(i)-(ii), (c)(3)-(6) (the checklist factors); Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008).  A "medical opinion" from a "treating source" that does not meet the two-part test cannot simply be rejected. Walls v. Colvin, 2015 U.S. Dist. LEXIS 154143, *8 (N.D. Ill. Nov. 13, 2015). Indeed, the opinion should still be given deference. Bochat v. Colvin, 2015 U.S. Dist. LEXIS 96227, *18 (E.D. Wis. July 23, 2015); Macek v. Colvin, 2013 U.S. Dist. LEXIS 139126, *48-49 (N.D. Ind. Sept. 27, 2013); Pursell v. Colvin, 2013 U.S. Dist. LEXIS 93775, *32 n.3 (N.D. Ill. July 3, 2013) (reinforcing that a non-controlling opinion is only discounted, not rejected).

Iain P. Johnson, *Every Picture Tells a Story:  A Visual Guide to Evaluating Opinion Evidence in Social Security Appeals*, <u>The Circuit Rider, Seventh Circuit Bar Association</u>, Vol. 20, April 2016, at 32-33.

Dr. Alahi's opinion differed substantially from other medical opinions discounted by the ALJ.  For instance, the rejected opinion of Dr. David McFadden consisted of a six line "to whom it may concern letter" which stated that Dr. McFadden considered Anderson "totally medically disabled" without specification of the specific functional limitations of Anderson. R. 1187. In contrast, Dr. Alahi opined that Anderson's mental condition: (1) precluded him from returning to his past work as an attorney; (2) left him "without the ability to maintain concentration, persistence and pace required by his former work and most work places;" (3) made it "extremely difficult for him to keep his mind on simple tasks and to perform them routinely or for any extended period of time given a regular workload;" (4) rendered him unable "to tolerate the pressures of work;" (5) would "lead to deterioration of function given his personality structure:" if he was placed "in a simple repetitive task performance environment;" and (6) caused him to be "disabled from regular work."  R. 1686, 2055.

The evidence supported ALJ's decision to discount the weight given to Dr. Alahi's opinion on the ultimate issue of whether Anderson was disabled and his opinion that Anderson could not work as an attorney. The question of whether a person is disabled is reserved to the Commissioner. See 20 C.F.R. § 404.1527(d). The opinion about whether Anderson could work as an attorney does not address the issue of whether he was disabled from all work.

Dr. Alahi's other opinions, however, were medical opinions about Anderson's ability to function in the structure and pressures of a work environment. These are proper medical opinions on functional limitations. These opinions are exactly the types of opinions given by Drs. Low and Mehr on the Psychiatric Review Technique and Mental Residual Functional Capacity Assessments. The ALJ gave no significant weight to these opinions because they were "contradicted by the claimant's description of his daily activities." The ALJ explained, "Despite his mental problems, the claimant is able to live independently and perform the tasks necessary to do so. He performs multiple simple tasks and detailed tasks during the day." R. 27.

This ALJ failed to explain how Anderson's ability to live alone and take care of himself and his dog contradicted Dr. Alahi's opinions that

Anderson could not withstand the pressures of the workplace. Daily activities in the home typically do not indicate whether that a person can withstand the pressures of a work environment:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons (in this case, Bjornson's husband and other family members), and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases. See *Punzio v. Astrue, supra,* 630 F.3d at 712; *Spiva v. Astrue, supra,* 628 F.3d at 351–52; *Gentle v. Barnhart,* 430 F.3d 865, 867–68 (7th Cir.2005); *Draper v. Barnhart,* 425 F.3d 1127, 1131 (8th Cir.2005); *Kelley v. Callahan,* 133 F.3d 583, 588–89 (8th Cir.1998); *Smolen v. Chater,* 80 F.3d 1273, 1284 n. 7 (9th Cir.1996).

Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012). Anderson's daily activities showed that he could perform simple or even some more complex tasks at home; however, the ALJ did not explain how this evidence showed that he could perform such tasks under the pressure and demands of a structured work environment. In discussing Anderson's credibility, the ALJ did not explain how Anderson's daily activities contradicted Dr. Alahi's opinion that Anderson could not tolerate the pressures of work and could not function in a structured performance environment. To the contrary, the ALJ discounted Anderson's disability by relying upon his description of his daily activities. The ALJ indicated claimant's allegation of complete and

total disability could not be accepted due to his description of his daily activities.  R. 26-27.  The Seventh Circuit recently held that an ALJ was not entitled to use the claimant's successful performance of life activities as a basis to determine that the claims of a disabling condition were not credible.  Ghiselli v. Colvin, 837 F.3d 771, 777-78 (7th Cir. 2016).  In Ghiselli the Seventh Circuit held, following Bjornson, that such a credibility determination ignores the critical difference between activities of daily living and activities of a full time job.

The ALJ's cursory analysis of the weight to be given to this treating physician's opinions was error and requires reversal.

The Commissioner cites the case of Alvarado v. Colvin for the proposition that daily activities could be used to evaluate a physician's opinions in order to evaluate "to assess whether 'testimony about the effects of his impairments was credible or exaggerated.'" Alvarado, 836 F.3d 744, 750 (7th Cir. 2016) (quoting Loveless v. Colvin, 810 F.3d 502, 810 (7th Cir. 2016)).  The claimant's daily activities in Alvarado were markedly different from Anderson's activities.  The claimant in Alvarado worked voluntarily in his mother's flower shop and performed "critical" tasks for the flower shop by picking up and delivering flowers.  Id., at 750.  The claimant also attended college.  He had secured with reasonable

accommodations an associate's degree and was "a few credits short of a bachelor's degree." Id. The ALJ in this case has not identified similar evidence that showed Anderson could perform in structured or pressured environments. The ALJ in this case, therefore, failed to explain how Anderson's daily activities contradicted Dr. Alahi's opinions.

On remand, the ALJ should also explain more fully the efficacy of the treatments of Anderson's migraine headaches. The ALJ stated that Anderson treated his headaches with Botox injections and pain medications, but she did not the determine the effectiveness of the treatments on any functional limitations from the headaches.

The ALJ should also state on remand whether she considered Anderson's obesity at Steps 4 and 5 of the Analysis. She stated that she considered his obesity at Steps 2 and 3, but did not clearly state whether obesity was considered at the other Steps in the Analysis. See SSR 02-1p, 2002 WL 34686281, at *3 (September 12, 2002) (obesity should be considered at Steps 2-5 of the Analysis).

The Court sees no error in the ALJ's treatment of the other opinion evidence. Dr. Lee provided no explanation for his opinion that Anderson's mental condition met or equaled Listing 12.04. Ample evidence supports the ALJ's finding that Anderson had moderate limitations in the ability to

concentrate, persist, and maintain pace, and either moderate or less than moderate limitations in any other area covered by 12.04(B). Anderson stated that he could focus and concentrate if something interested him. Anderson also did not suffer from the severe degree of mental illness contemplated by 12.04(C). He was able to live by himself without a highly supportive environment or psychosocial supports.

The ALJ also accurately noted that Dr. McFadden's opinions were limited to November 2011 through June 2012. This was less than 12 months. The ALJ could reasonably conclude that the opinions did not address whether Anderson's conditions on which Dr. McFadden based his opinions would continue for more than twelve months. There was no error.

The ALJ's treatment of Anderson's sleep apnea was supported by substantial evidence. The healthcare professionals at INI, Mayo Clinic, and St. Francis Medical Center stated that Anderson's sleep apnea was not well controlled because he did not follow their instructions. He did not maintain good sleep hygiene or practices, such as setting a regular bedtime and using his CPAP every night. The ALJ could reasonably conclude from these professionals' notes that Anderson's sleep apnea would not cause significant impairments if he followed their instructions.

The ALJ's RFC assessment was dependent on her evaluation of Dr. Alahi's opinion. The Court, therefore, will not address that assessment at this time. On remand, the ALJ will reconsider Dr. Alahi's opinion, along with existing record and any other evidence presented on remand to determine the correct RFC.

THEREFORE, Plaintiff Kent Anderson's Motion Summary Judgment (d/e 14) is ALLOWED, Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 21) is DENIED, and the decision of the Commissioner is REVERSED and REMANDED pursuant to 42 U.S.C. § 405(g) sentence four.

ENTER: March 23, 2017

_____ s/ Tom Schanzle-Haskins _____
UNITED STATES MAGISTRATE JUDGE